**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**CASE NO. 08-cv-6416-PAM/AJB**

Marty H. Segelbaum, Inc., d/b/a,
MHS Licensing, a Minnesota corporation,

      Plaintiff,

vs.

M W Capital, LLC, a Delaware limited-
liability company, f/k/a PTI Sports, LLC;
Pacific Cycle, Inc., a Delaware corporation,

      Defendants.

---

**DEFENDANT M W CAPITAL, LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant M W

Capital, LLC, f/k/a PTI Sports, LLC ("MW Capital"), respectfully files its motion to

dismiss the Complaint filed by Marty H. Segelbaum, Inc. ("MHS") and states as follows.

## I.    INTRODUCTION

Minnesota law makes clear that an agreement for the payment of commissions on

sales of a product "for the life of the product" terminates when the contracting party stops

selling the product.  "For the life of the product" is a contractual phrase that limits a

party's obligation to pay commissions to the period when that party is selling the product.

The broker agreement (the "Broker Agreement") at issue in this case has an explicit "life

of the product" provision.  Yet, MHS has filed this action claiming that MW Capital is

{M2777050;3}

required to pay commissions on products that MW Capital is no longer selling.  This claim is frivolous and fails as a matter of law.

As the Complaint alleges, MHS assisted MW Capital to procure licenses to use entertainment trademarks, such as Dora the Explorer, Scooby Doo, and Thomas the Tank, in bicycle accessories and parts manufactured by MW Capital.  But as MHS admits, (1) MW Capital is no longer selling bicycle accessories or parts bearing the trademarks brokered by MHS and (2) MHS was paid for all commissions due until MW Capital stopped selling bicycle accessories and parts.  These facts, which are established by MHS's own allegations, are fatal to MHS's claim for commissions under the Broker Agreement.

MHS tries to muddle the waters by alleging that the brokered licenses were assigned to Pacific Cycle, Inc. ("Pacific").  The Complaint, however, demonstrates that MW Capital and Pacific are two separate, independent companies.  MW Capital sold all its assets to Pacific.  But under Minnesota law, a sale of assets is not a merger and it does not extend the term of a "for the life of the product" commission or royalty agreement.

Tacitly admitting the failure of its breach of contract claim, MHS suggests that MW Capital agreed to continue paying MHS in perpetuity if MHS procured the assignment of the trademark licenses to Pacific.  This allegation is categorically false.  But more importantly at this stage of the proceedings, MHS has failed to produce any written agreement or document that could even remotely support this claim.  As such, this claim is barred by the statute of frauds.

MHS's  claims for declaratory relief, unjust enrichment, and civil conspiracy – which seek MHS's purported contractual damages – similarly fail.  MHS cannot revive its breach of contract claim by suing in tort, equity, or under the Declaratory Judgment Act. Further, these claims fail because:

- MHS's claim for declaratory relief is duplicative of its failed breach of contract claim;

- MHS's claim for unjust enrichment is barred by the existence of the Broker Agreement; and

- MHS has failed to sufficiently plead the elements required to state a claim for civil conspiracy.

Accordingly, this action fails as a matter of law and must be dismissed in its entirety.

## II.   BACKGROUND
### (Based on the Complaint's Allegations)

Until June of 2008, MW Capital was a designer and manufacturer of bicycle parts, helmets, and other accessories.  *See* Compl. at ¶¶ 2, 18.  On May 1, 2005, MW Capital entered into a Broker Agreement with MHS – a broker specializing in negotiating license agreements between trademark owners and product manufacturers such as MW Capital. *See id.* at ¶¶ 1, 9.  The Broker Agreement is governed by Minnesota law.  *See* Broker Agreement (attached as Exhibit 1 to the Complaint) at § 12. [1]

---

[1] In deciding MW Capital's motion to dismiss, this Court may consider the exhibits attached to the Complaint.  *See Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir.1999).

Under the Broker Agreement, MHS was to "assist" MW Capital in securing trademark licenses for MW Capital's products. This assistance included the "preparation of proposals, arranging and participating in telephone conversations, in-person meetings, and negotiating License Agreements." *See* Broker Agreement at § 2(a). MHS's base compensation under the Broker Agreement was a retainer fee in the amount of "$2,000 due and payable upon execution of this Agreement, and on the first of each following month through expiration of this Agreement." *See* Broker Agreement at § 4(a). Additionally, MHS was to be paid a commission on the sales of all MW Capital's products bearing the brokered trademarks:

> The Commission will be an amount equal to two percent (2%) of the Net Sales of Licensed Products, to be paid to the Consultant for the life of each Licensed Product. Such Commission shall be credited against the amount of the Retainer Consultant has received.

*See* Broker Agreement at § 4(b).

The term "Licensed Products" was defined as "products bearing . . . any intellectual property and its related trademark logos, and/or artwork copyright owned by Licensor." *See id.* at § 1(c)-(d).

Each commission statement was to be accompanied by an itemized statement "setting forth the actual number of all Licensed Products sold, and the Net Sales thereof, during the proceeding three (3) month period." *See id.* at § 6. Further, under the Broker Agreement, MHS had the right to inspect and audit MW Capital's records pertaining to the sales of products bearing the brokered trademarks. *See id.* at § 7.

Nothing in the Broker Agreement required MW Capital to sell products bearing trademarks brokered by MHS.  Nor did the Broker Agreement prevent MW Capital from selling its assets and stop manufacturing bicycle parts.

For almost three years, MW Capital dutifully paid MHS 2% of its sales of products bearing trademarks brokered by MHS.  *See* Compl. at  ¶ 13.  On April 7, 2008, however, MW Capital informed MHS that its business assets were being acquired by Pacific.  MHS claims that MW Capital asked MHS to contact the owners of the various entertainment trademarks to "facilitate assignment of the existing licenses to Pacific." *See id.* at ¶ 14.

Pacific purchased all the assets of MW Capital on June 26, 2008, and MHS was paid its commissions through this date.  *See* Compl. at ¶¶ 18, 23.

MHS filed this action against MW Capital and Pacific, claiming that it was entitled to a percentage of Pacific's sales of  products bearing the brokered trademarks.

### III.  STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss, a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, ___, 127 S.Ct. 1955, 1965 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1964-65. A complaint must contain "enough facts to state a claim to relief that is

plausible on its face." *Id.* at 1974; *see also Hollis v. Northland Group, Inc.*, 2009 WL 250075, *1 (D.Minn. 2009). It must contain facts with enough specificity "to raise a right to relief above the speculative level." *See Twombly,* 127 S.Ct. at 1964-65. This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 1965. The Complaint here falls far short from complying with this pleading standard, and as such must be dismissed for failure to state a claim upon which relief can be granted.

## IV.   ARGUMENT

### A.   MHS's Breach Of Contract Claim Fails As MW Capital Is No Longer Selling Products Bearing The Brokered Trademarks.

The Broker Agreement has an explicit, unambiguous "life of the Licensed Products" provision. As such, MHS is not entitled to any commission after MW Capital stopped selling products bearing the trademarks that MHS procured.

Under Minnesota law, contract language is interpreted "according to its plain and ordinary meaning." *See Rasmusson v. Sten Corp.*, 2007 WL 4394405, *3 (Minn. App. Dec. 18, 2008); *see also Bob Useldinger Sons, Inc. v. Hangsleben,* 505 N.W.2d 323, 328 (Minn. 1993). When the words of a contract are clear, "it is neither necessary nor proper in construing [a contract] to go beyond the wording of the instrument itself." *See The Telex Corp. v. Date Prods. Corp.,* 135 N.W.2d 681, 686-87 (Minn. 1965). If no ambiguity exists, interpretation of a contract is a question of law. *See City of Virginia v. Northland Office Props. Ltd.,* 465 N.W.2d 424, 427 (Minn. App. 1991).

Under the Broker Agreement, MW Capital was to pay MHS (1) a monthly retainer fee of $2,000 – payable during the term of the Broker Agreement irrespective of whether MHS procured any license for MW Capital and (2) a commission in the amount of 2% of the net sales of the MW Capital's products bearing the brokered trademarks "for the life of" each product.  *See* Broker Agreement at § 4.  Under Minnesota law, the use of the limiting contractual phrase for the life of the product means that MHS was entitled to the payment of commissions "for so long as" products with the brokered trademarks "continued to be possessed and sold" by MW Capital "or its successor or assignee."  *See Rasmusson*, 2007 WL 4394405, at *4.

*Rasmusson* is particularly illustrative of the meaning of the limiting phrase "the life of the product" under Minnesota contract law.  *Rasmusson* involved a license agreement allowing the defendant to sell a number of disposable medical products designed by the plaintiff.  As compensation for this license, the defendant agreed to pay a commission of up to 4% of the net sales of the products for "the life of the products." Approximately fives years after the agreement, the defendant sold its assets to another company.  The plaintiff, like MHS here, was paid all the commissions due until the date of the sale of assets.  But the plaintiff claimed that the defendant had to pay him a percentage of the sales of the products for as long as the products were sold by the company that purchased the defendant's assets.  The trial court ruled that the plaintiff's breach of contract failed as a matter of law, and the Minnesota court of appeals affirmed. After determining that the agreement was not ambiguous, the appellate court concluded

that the phrase "life of the products" limited the defendant's obligation to pay royalties to any product sold by the defendants, its successors or assigns:

> Based on the plain and ordinary meaning of "life of the products" read in context with the other provisions of the license agreement, we conclude that [the plaintiff] was entitled to receive royalty payments from [the defendant], or from [the defendant's] successors and assigns, for so long as [the plaintiff's] products continued to be possessed and sold by [the defendant] or its successor or assignee.

See 2007 WL 4394405 at * 3.

The court then reasoned that under this construction neither the defendant nor the company that had acquired the defendant's assets was responsible for payment of royalties after the defendant stopped selling the licensed products. *See id.* The court noted that the defendant was no longer selling the licensed products and that the plaintiff had been paid for all commissions owed for products sold by the defendant. *See id.* The court further concluded that the company that had purchased the defendant's assets was not the defendant's successor or assignee because a purchase of assets was not a merger or reorganization, but a transaction between two separate and distinct companies. *See id.*

The reasoning of *Rasmusson* is controlling here and requires the dismissal of MHS's breach of contract claims. The Complaint demonstrates that MW Capital is no longer selling any product bearing the trademarks procured by MHS. *See* Compl. at ¶ 18. Moreover, MHS admits that it was paid all commissions owed for products sold by MW Capital:

> From the commencement of the Agreement up through December, 2007, [MW Capital] paid Commissions due to MHS in accordance with the terms of the Agreement.

*See* Compl. at ¶ 13; *see also id*. at ¶ 23 (acknowledging payment of commissions for first and second quarters of 2008).

On these facts, MHS cannot possibly have a claim for breach of the Broker Agreement. Under *Rasmusson*, the limiting phrase "the life of each Licensed Product" in the Broker Agreement means that no commission is owed if MW Capital does not sell any product bearing the brokered trademarks.

Various sections in the Broker Agreement confirm that the payment of commissions was contingent on sales made by MW Capital. For example, § 6 of the Broker Agreement requires that each commission payment "be accompanied by an itemized statement setting forth the actual number of all Licensed Products sold, and the Net Sales thereof, during the preceding three (3) month period." Similarly, § 7 gives MHS the right to inspect

> records pertaining to sales of Licensed Products. Should records disclose a deficiency of five (5) percent or more between the amount found to be due to [MHS] and the amount actually paid, then [MW Capital] shall be responsible for payment of the entire deficiency, as well as the costs and expenses of the audit and inspection.

By definition, MW Capital cannot comply with any of these requirements if it is not directly selling any product bearing the brokered trademarks. MW Capital could not possibly have expected to have perpetual access to a third-party's sales figures, nor could it have granted MHS access to a third party's records.

There is simply no support for the claim that MW Capital was obligated to pay a commission to MHS for sales made by a third party. Under the Broker Agreement, MW Capital's obligation to pay a commission was contingent on MW Capital's sales of bicycle

accessories and parts bearing the brokered trademarks.  Because MW Capital is no longer selling any such product, no commission is owed under the Broker Agreement and MHS's breach of contract claim fails as a matter of law.

**B.    MHS's Claim For Breach Of An Oral Contract Is Barred By The Statute of Frauds.**

In an unavailing effort to salvage its breach of contract claim, MHS alleges that it orally agreed to procure the assignment of the brokered trademark licenses to Pacific in exchange for the continued payment of a percentage of Pacific's sales.[2]  But any claim of an oral agreement is barred by the statute of frauds.  Under the statute of frauds, an "agreement that by its terms is not to be performed within one year" cannot be the basis of a breach of contract claim "unless [the] agreement, or some note or memorandum thereof, ... is in writing, and subscribed by the party charged therewith."  *See* Minn. Stat. § 513.01(1) (2006).  "The statute expresses a public policy of preventing the enforcement ... of contracts that were never in fact made."  *See Amasia Acoustics, LLC v. GN Hearing Care Corp.,*  2008 WL 5137087, *3 (Minn. App. Dec. 9, 2008) (*citing Radke v. Brenon,* 134 N.W.2d 887, 890 (Minn. 1965)).  The statute of frauds similarly bars enforcement of any unwritten modification of a contract with a duration of more than one year.  *See County of Polk v. Minn. Dehydrated Vegetables, Inc.*, 2000 WL 821656, *1 (Minn. App. 2000) ("Under Minnesota's statute of frauds, however, any modification to this contract

---

[2]This claim is not plead as a separate count.  Instead, it is muddled within the count for breach of a written contract.  This pleading failure alone requires the dismissal of this claim.  *See* Fed.R.Civ. 10(b); *see also Reinholdson v. Minnesota*, 2002 WL 32658480, *2-3 (D.Minn. 2002) (*citing Academic Travel Abroad, Inc. v. Kupper,* 54 F.R.D. 576, 577 (E.D.Wis.1972) ("claims should be stated separately, rather than 'intermingled and confused.'")

was required to be in writing because the contract was for a five-year term and could not be performed within a year").

MHS here seeks to enforce a purported oral agreement for the payment of commissions in perpetuity.  This agreement is by definition an agreement that cannot not "be performed within one year."  Plaintiff has not (and cannot) allege the existence of a written document memorializing any such oral agreement between MHS and MW Capital.  Without any documentary support, MHS cannot sue for breach of a contract that is alleged to extend for over one year, let alone one that is alleged to continue in perpetuity.  As such, MHS's claim is barred by the statute of frauds and should be dismissed.

### C.      MHS Cannot Revive Its Failed Breach Of Contract Claim By Suing For Unjust Enrichment.

MHS seeks to circumvent the deficiencies of its breach of contract claim by suing for unjust enrichment.  Indeed, in its unjust enrichment claim, MHS seeks the same purported contractual damages that it claims in its failed breach of contract claim.  MHS's claim for unjust enrichment is, however, barred by the existence of a contract, namely the Broker Agreement.  *See Sterling Capital Advisors, Inc. v. Herzog,* 575 N.W.2d 121, 126 (Minn. App. 1998) ("The existence of an express contract between the parties precludes recovery under the theories of quasi-contract, unjust enrichment, or quantum meruit."); *Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Can., Ltd.,* 552 N.W.2d 254, 268 (Minn. App. 1996) (stating that "equitable relief cannot be granted where the rights of the parties are governed by a valid contract").  Indeed, in *Sterling*, the court explicitly held

that the existence of a broker agreement bars a broker's unjust enrichment claim for commissions.  *See* 575 N.W.2d at 126-27.

The existence of a contract "forecloses a claim for unjust enrichment, not only if the plaintiff is successful on the contract claim but also if the plaintiff was unsuccessful, so long as a contract was formed and it governs the matter in dispute." *See Superior Lake Street Prop., LLC v. Wayzata Bay Center, LLC*, 2008 WL 3897571, *3 (Minn. App. 2008); *see also Thomas & Betts Corp. v. Leger*, 2004 WL 2711391, *13 (Minn. App. 2004).  Here, MHS does not have a claim for breach of contract because MW Capital is not obligated to pay any additional commission.  But the existence of a contract governing the parties' relationship is fatal to MHS's unjust enrichment claim.

**D.    MHS's Claim for Declaratory Relief Should Be Dismissed As Duplicative of The Breach Of Contract Claim.**

MHS's claim for declaratory relief under 28 U.S.C. § 2201 should similarly be dismissed as duplicative.  The Eighth Circuit has made clear that a district court has broad discretion to dismiss a claim for declaratory relief under § 2201:

> The Declaratory Judgment Act confers upon federal courts unique and substantial discretion in deciding whether to declare the rights of litigants … The Act confers a discretion on the courts rather than an absolute right upon the litigant ... In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.

*Canal Insurance Co. v. Ashmore,* 126 F.3d 1083, 1087-1088 (8th Cir. 1997) (*citing Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995)).

Based on this principle, courts generally dismiss declaratory relief claims that are duplicative of other claims alleged in the operative complaint. *See, e.g., O'Neil v. Simplicity, Inc.,* 553 F.Supp.2d 1110, 1113 n.4 (D.Minn. 2008); *Ticketmaster, LLC v. RMG Tech., Inc.,* 536 F.Supp.2d 1191, 1199 (C.D. Cal. 2008). Dismissal in such cases is particularly appropriate because the purpose of declaratory relief "is to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues." *See In Re Methyl Tertiary Butyl Ether,* 457 F.Supp.2d 455, 467 (S.D. N.Y. 2006).

In its purported claim for declaratory relief against MW Capital, MHS seeks a declaration that (1) it has fulfilled all of its performance obligations and is entitled to commissions for the life of the licensed products; (2) that the obligation to pay commissions to Plaintiff was not terminated by MW Capital's sale of assets to Pacific, and (3) that MW Capital is liable for "the obligation to pay Commissions under the terms of the Agreement." *See* Compl. at ¶ 26. All of these issues are encompassed in MHS's failed claim for breach of contract. As such, the claim for declaratory relief serves no purpose here other than to duplicate – and waste – judicial resources.

Moreover, even if the claim for declaratory relief were not duplicative, it fails as a matter of law because, as explained above, MHS is not owed any commission under the Broker Agreement. *See Essling's Homes Plus, Inc. v. City of St. Paul*, 356 F.Supp.2d 971, 984 (D.Minn. 2004) ("a successful action for declaratory judgment requires a viable underlying cause of action).

**E.      MHS Has Not Sufficiently Pled a Claim For Civil Conspiracy.**

To state a claim for civil conspiracy under Minnesota law, at a minimum, a complaint must allege facts showing that the purported conspirators had (1) "a meeting of the minds as to plan or purpose of action to achieve a certain result" and (2) "an underlying tort."  *See Steele v. Mengelkoch*, 2008 WL 2966529, *2 (Minn. App. 2008) (*citing Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (1950); *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. App. 1997)).  Neither of these elements is sufficiently alleged in the Complaint.

Conclusory and general allegations of conspiracy are insufficient.  *See In Re Tempromandibular Joint Implants*, 113 F.3d 1484, 1498 (8th Cir. 1997); *see also Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063-64 (8th Cir. 2005).  A plaintiff cannot survive dismissal by merely alleging that a conspiracy existed without describing the nature of the alleged conspiracy.  *See id.*  Accordingly, a claim for conspiracy that is pleaded generally and without ultimate facts supporting the requisite elements of the conspiracy must be dismissed.  Courts will not infer unpleaded facts to support a deficient, unsupported claim of conspiracy.

> It has long been the law in this and other circuits that complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts. . . .  Despite language hinting at a wider conspiracy, the plaintiff has failed to plead facts supporting these vague claims, and the courts need not conjure up unpleaded facts to support these conclusory suggestions.

*Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977); *see also Fairbanks v. City of Bradenton Beach*, 733 F. Supp. 1447, 1451 (M.D.Fla. 1989) ("Even taking the complaint

in the light most favorable to [p]laintiff, it contains no factual allegation of conspiracy to terminate [p]laintiff.  Plaintiff asserts a conclusory statement of conspiracy which is not supported in any manner by the factual allegations of the complaint.").

MHS claims, in a conclusory fashion, that MW Capital and Pacific "participated in a civil conspiracy among themselves by assigning the licenses procured by MHS to Pacific with intent of avoiding the obligation to pay Commissions to Plaintiff under the terms of the Agreement."  *See* Compl. at ¶ 46.  This is precisely the sort of vague, conclusory statement that federal courts have repeatedly rejected as insufficient to plead a claim for civil conspiracy.  There is not a single specific fact alleged in the Complaint that can remotely support the existence of a conspiracy between MW Capital and Pacific. MHS claims that "upon information and belief Pacific was aware of MHS's cooperation and involvement in getting the Licensors' consent to assignment of the existing licenses." *See* Compl. at ¶ 15.  But being "aware" of somebody's purported actions is not sufficient to plead conspiracy.   To survive dismissal, MHS has to plead facts showing a "combination" between MW Capital and Pacific "to accomplish an unlawful purpose or a lawful purpose by unlawful means."  *See Steele*, 2008 WL 2966529, at *2 (*citing Harding v. Ohio Cas. Ins. Co.,* 41 N.W.2d 818, 824 (Minn. 1950)).  This MHS has not done and cannot do because there is nothing unlawful about MW Capital's decision to sell its assets to Pacific.

MHS's conspiracy claims also fail because a conspiracy requires an underlying tort or wrong.  *See Noble Sys. Corp. v. Alorica Cent., LLC,* 543 F.3d 978, 986-87 (8th Cir. 2008) (affirming dismissal of civil conspiracy claim that was not based on an underlying

tort); *In Re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 n. 7 (3d Cir. 1999) (surveying state law in a multidistrict litigation case and concluding that "a cause of action for civil conspiracy [uniformly] requires a separate underlying tort as a predicate for liability").  Liability for a civil conspiracy stems not from the conspiracy itself, but from the commission of a civil wrong that is accomplished through the conspiracy and that results in injury to the plaintiff.  *See id.*

Here, MHS has utterly failed to allege any facts which show an underlying tort or wrong was committed by either MW Capital or Pacific.[3]  The Complaint asserts an inchoate claim for tortious interference with contract against Pacific.  But this tort cannot be the basis of the civil conspiracy claim as MW Capital cannot interfere with its own contract.  *See Guion v. Chamber of Commerce of U.S.A.*, 2001 WL 1034665, * 4 (Minn. App. 2001) (*citing Bouten v. Richard Miller Homes, Inc.,* 321 N.W.2d 895, 901 (Minn. 1982)) (a company's "interference with its own contract is not actionable.")

As such, MHS's claim for civil conspiracy must be dismissed.


## V.  <u>CONCLUSION</u>

For the foregoing reasons, M W Capital, LLC respectfully requests that the Complaint be dismissed, and that this Court grant such other and further relief as it deems just and proper.

---

[3]MHS claims that it was "deceive[d]" by MW Capital and Pacific.  *See* Compl. at ¶ 48.  But this inchoate allegation does not come even close to pleading fraud with the specificity and particularity required to state a cause of action.  *See Kranz v. Koening*, 484 F.Supp. 997, 1002 (D.Minn. 2007) (""In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity.").

February 12, 2009.

Respectfully submitted,

FAEGRE & BENSON LLP

s/ Brian Melendez
Brian Melendez, No. 223633
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Ph. 612.766.7309
Fax 612.766.1600

in association with

AKERMAN SENTERFITT
Michael Marsh, Fla. Bar No. 0072796,
    michael.marsh@akerman.com
Francisco A. Rodriguez, Fla. Bar No. 0653446,
    francisco.rodriguez@akerman.com
SunTrust International Center
One S.E. Third Avenue – 25th Floor
Miami, Florida  33131-1704
Ph. 305.374.5600
Fax 305.374.5095

**Counsel for Defendant M W Capital, LLC**